STATE of Missouri, Appellant,

v.

Maria L. BROOKS, Respondent.

No. WD 64887.

Missouri Court of Appeals, Western District.

March 7, 2006.

---

Daniel Christian Miller, Kansas City, MO, arguing on behalf of Appellant.

Randall John Schlegel, Kansas City, MO, arguing on behalf of Respondent.

Before VICTOR C. HOWARD, P.J., JAMES M. SMART, JR., and THOMAS H. NEWTON, JJ.

JAMES M. SMART, JR., Judge.

The State appeals the trial court's granting of a motion to suppress incriminating statements Defendant Maria Brooks made to the police prior to receiving *Miranda* warnings. Ms. Brooks was interrogated by police in connection with the suffocation death of an infant girl that Brooks had been babysitting. The State contends that no warnings were required because Brooks was not in custody when she gave the statements. We affirm in part, reverse in part, and remand for further proceedings.

## Factual Background

On January 7, 2004, at 2:20 p.m., twenty-five-year-old Maria Brooks called 911 from her home to report that Amara Springer, the child she was babysitting, was not breathing. The fire department and emergency personnel arrived at Brooks' residence. The nine-month-old child was transported to the hospital.

Detective Michelle Rogers of the Raytown Police Department arrived at the scene shortly after the 911 call. The detective questioned Brooks about what had happened to the child. Brooks stated that she was babysitting Amara, who was her boyfriend's grandniece, and that the child had a bad cold and cough. She said she put the baby on its back on the couch and covered it up to its knees with a blanket. She put a pillow next to the baby's side so that it would not roll over. Brooks stated

that she then laid down and went to sleep on the long end of the couch. When she woke up about an hour later, she discovered that the baby was not breathing and called 911.

Detective Rogers asked Brooks if she would come to the station to give a formal statement. Brooks agreed. Detective Rogers drove Brooks to the police station because Brooks did not have an available vehicle. The detective took Brooks to a small interrogation room in the basement.

The interview started at around 3:45 p.m.[1] The detective and Brooks were seated diagonally across the table from one another. The detective and Brooks were alone in the room. The detective openly recorded part of the interview by audiotape. Also, the detective surreptitiously recorded the entire session by videotape.

The detective said: "[A]nytime you decide that you don't want to talk to me or whatever just say, [']Michelle I don't want to talk anymore[.]['] But I would like ... just to get this all finished with today, but it may ... take a bit but we'll get through it." Detective Rogers informed Brooks that she could take a break for food or to use the bathroom and that she would take her home when they were finished.

Brooks stated that she had been babysitting Amara with some regularity so that Amara's mother could work. She said that Amara's mother, who is the niece of Brooks' boyfriend, dropped Amara off at Brooks' house the night before. Brooks explained how she put the child to bed that night. She also gave an account of the following day, leading up to the 911 call. Her account was that she laid Amara down for a nap on the floor. The child woke up

---

1. All time references are to actual time rather than to the time displayed on the videotape recording, which does not show accurate time.

crying and coughing so Brooks gave her some medicine. She then laid Amara down on a sectional couch, placing a blanket over her. Brooks took a nap with her, lying on the "longer portion" of the couch. A "weird feeling" that something was wrong caused Brooks to wake up and discover that the child was not breathing.

After Brooks finished her description, she stated that she was tired of talking, and she said that she wanted "to get home to [her son]." Detective Rogers asked Brooks if they could go over everything again to make sure "[they] got it right." Brooks said that would be okay. Detective Rogers said if they got the story right, then they would "w[h]iz through [the story] again [a third time] on a recorder."

The second round of questions produced largely the same questions and answers. At around 5:30 p.m., Brooks again stated that she wanted to go home to her son. The detective responded that "we should be just about another half hour and that's it. Okay?" Brooks nodded in agreement.

The detective then left the room for a restroom break. When she returned a short time later, Brooks asked if she could use the telephone to call her employer to let them know she would not be in to work. The detective said that she could and again left the room. Brooks placed the call, but no one answered. Brooks then called her boyfriend. Brooks' side of the telephone conversation was recorded on the videotape. She told her boyfriend,

> ... I just figured I'd call and let you know I'm still up here. She said the next 30 minutes and we should be done. Then she'll give me a ride back home. Was he ... ah ... what thing? Oh okay .... uh ... huh ... uh ... huh. I know honey it was not my fault. I know. It was not my fault honey.... The detectives and everything told me this happens to a lot of babies and they

don't know why it happens. It could be anything they said. I mean cause she's been having a hard time breathing and everything....

In that telephone call, Brooks learned from her boyfriend that the baby was declared dead. This news upset her, causing her to cry.

The detective returned. Brooks, who was still on the phone, was in tears.

Q. Maria?

A. Yeah.

Q. We gotta finish. Okay?

A. (Speaking to person on phone). Okay. I gotta finish up and then I'll be on my way home. Okay. I have to go so we can finish this. This way I can come home. I love you. Bye. (Still crying.) ... I don't think I can finish after what I just heard.

Q. Why don't you sit back up here Maria. I'm sorry. I know it's tough.

A. Her mom is trying to blame it on me.

Q. Things happen. Okay. You just gotta realize right now that everybody's upset. Okay.

A. They want to try to blame me for it though. Nothing I can do ... say ...

Q. Maria? Can we get through it and then I can get you home and you can ... you can relax. Try to relax and lay down a bit.

A. I mean she could had that flu that was going around even.

Q. ... um ... hum.

A. I mean if they're trying ... she's ... her mom's trying to blame me for it.

Q. I know. If she's trying ... if she's trying to blame you for it that's why ... that's why it's so important that I go through all this and get everything in detail. Okay? Are you feeling okay other than just being upset?

A. ...

Q. Hum?

A. When we do that tape can you just ask me like yes or no questions?

Q. No. We gotta go through in detail. Let me go get you some Kleenexes okay?

A. ...

The detective then activated an audio-tape recorder for the ostensible purpose of recording the questioning (although the video recorder continued to record as well). It was about 6:05 pm. The detective used her notes to formulate the questions. The third interview was essentially a repeat of the first two. Again, the questions first focused on background information, then shifted to the events preceding Amara's death. Brooks detailed how she found the child not breathing and called 911. At around 6:36 p.m., the audiotaped statement was complete. The detective asked Brooks whether any promises or threats were made to induce the statement. Brooks said no. The detective asked whether Brooks voluntarily made the statement. Brooks said yes. The detective stated, "This'll be the end of the report," and turned off the audio recorder.

Brooks was still teary. The detective had changed her position so that she and Brooks were now seated with little space between them, directly across from one another. At this point, she began leaning forward with her elbows resting on her knees, looking directly into Brooks' face. The detective told Brooks, "I promise we'll leave after this." Thus began the stage we can call the "fourth stage" of the interrogation. The detective immediately went into a long monologue.

Q. Okay. Now I just want to ... I promise we'll leave after this. I just want to make sure because like I said the Medical examiner's office is going to come out tonight and

they're going to do the positioning of the baby and the doll and everything. And they'll be further investigation done tomorrow morning on the baby and I just want to make sure that nothing else happened. That nothing else ... you know ... that maybe something ... I don't know. I'm just saying that if ... if there's something that you're leaving out and you're not telling me. I need you to tell me, so I can help you and help figure it out. Because we don't want this to happen to another baby. Okay? So if ... if there's anything ... anything that you're not telling me or ... you know ... something happened that maybe things got out of control or anything like that. We need to talk about it tonight. As opposed to us finding out later on in the investigation. You understand what I'm saying because ... cause it will come out. The Medical Examiner will be able to determine ... you know ... how the baby died. And we know that probably tomorrow or the next day, so ... like I'm saying. I just want you to know Maria that if there's something ... something happened that you're not telling me or ... or what have you or you're tired or what have you we need to talk about it now before it goes ... it goes any further. You understand where I'm going from and what I'm saying?

The detective's monologue continues for several more minutes with only a few short remarks from Brooks interspersed. The detective then repeatedly asked Brooks what else she was not telling her. She stated that the police would find out, so it would be best to tell her first. Brooks

maintained that she had told the detective everything.

The detective continued to probe. Brooks finally stated, after further probing, that the baby may have suffocated under the blanket that was wrapped around her head. Brooks stated that the baby "was holding onto" the blanket, and that she "pulled it off" the baby. She noticed the baby's lips were blue "and she was all limp." Detective Rogers interrupted Brooks. The detective continued: "[I]f that's what happened . . . I need you to tell me about it. 'Cause . . . I'm going to find out about it tomorrow at the Medical Examiner's office. . . . I know that . . . you're still not telling me the full truth."

The detective said:

I know the baby didn't pull the blanket up over its head like and didn't suffocate itself on its own. I know that . . . that she didn't . . . she didn't do that. That's impossible. She didn't do it. I know it's possible that she was crying so much that you thought oh if she could just quit crying for a few minutes . . . you know . . . and if she would just go back to sleep.

Brooks, her voice breaking, answered, "You're right. I put the blanket over her."

(The video shows that Detective Rogers placed her hands on Brooks, and patted her, while handing her some more tissue.)

Q. Okay. Okay. That's okay sweetie.

A. It hurts coming out.

Q. Pardon me? I know.

A. I just wanted her to be quiet.

Q. I know you did. I know.

A. I didn't think I would hurt anybody.

Q. Here. Okay. Let me, we're going to get through it. Okay. Alright.

A. I'm not in trouble am I?

Q. Well, we'll talk about that. Okay. Now before I talk to you anymore. I'm going to read you a statement. Okay. You must understand your rights before we ask you any questions. You have the right to remain silent. Anything you say can and will be used against you in a court of law or other proceedings. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you can not afford to hire a lawyer one will be appointed to represent you before any questioning if you wish. You can decide at anytime to exercise these rights and not answer any questions or make any statements. I have read this statement of my rights and I understand what my rights are. Do you understand everything I read to you?

A. Yeah.

This was the first time that Brooks was informed of her *Miranda* rights. Brooks was given the form to sign indicating that she understood. Brooks signed the form, indicating she understood her rights. This began what we will call the fifth stage of the interrogation. The detective then, without asking if she wished to waive her rights and continue talking, continued, "Now tell me what happened when you . . . cause what you were telling me all up until you putting her onto the couch or . . .

A. She was on the couch.

Q. Okay. Up until that point is everything you're telling me what happened the truth . . .

A. Yes."

After additional questioning, Brooks finally admitted that she placed the blanket over the child's face and put pressure on it for "about a minute" until she stopped crying. The detective then re-activated the audiotape recorder to record Brooks' confession.

Brooks was formally placed under arrest. She eventually was charged with second-degree felony murder, § 565.021.1(2);[2] first-degree endangering the welfare of a child, § 568.045; and abuse of a child resulting in death, § 568.080.[3]

## Motion to Suppress

Brooks filed a motion to suppress the incriminating statements she made to Detective Rogers at the police station. She claimed that the statements were made during a custodial interrogation; and, therefore, *Miranda* warnings were required. At the hearing, both Detective Rogers and Brooks testified.

Detective Rogers testified that it is her normal practice to conduct three rounds of questions. Rounds one and two assist her in determining what questions to ask during the third session, which is audiotaped for transcription. Detective Rogers testified that Brooks was not under arrest. The detective stated that she did not believe Brooks was even a suspect until Brooks stated that she had pulled the blanket up over the baby's face. Although the detective said it was normal to do such an interview in three stages, she did not offer any explanation for the portion of the interrogation after the three stages—when she sought to detain Brooks for "this," (without saying what "this" was). Nor was the detective asked about the purpose of the "this" stage—which we will refer to as the fourth stage.

Defense counsel, in questioning Detective Rogers about the interrogation, did secure her acknowledgement that she was aware that the child's mother had stated that Brooks was "not very bright ... not very smart." Although Detective Rogers informed Brooks she could stop talking to her at any time, she admitted that she never actually explicitly told Brooks at any time that she was free to leave.

Brooks testified briefly. She testified about her poor educational background and very limited employment history, including working at McDonald's and Wal-Mart. Brooks had had no prior involvement with the police. Neither the State nor the defense inquired about her perceptions of the interrogation.

The trial court, after hearing the testimony and reviewing the record of the interrogation, granted the motion to suppress, ordering "any and all statements" the defendant made at the police station inadmissible at the upcoming trial. The State appeals, contending the circuit court erred in granting the motion to suppress on *Miranda* grounds.

## Standard of Review

The State, as the appellant, has the burden of demonstrating trial court error in holding that the statements at the police station should be suppressed. *See State v. Cella*, 32 S.W.3d 114, 117 (Mo. banc 2000); *State v. Hensley*, 770 S.W.2d 730, 731 (Mo. App.1989). The State also had the burden at the suppression hearing to show by a preponderance of the evidence that the motion to suppress should be denied and the evidence should be admitted. *State v. Birmingham*, 132 S.W.3d 318, 320 (Mo. App.2004).

## "Custodial Interrogation"

 The privilege against self-incrimination includes the requirement that the

---

**2.** All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise noted.

**3.** This is the statute number listed in the indictment, which this court notes does not correspond to the described felony of "abuse of a child"; however, this error is not determinative to the outcome of this appeal.

police warn those taken into custody that they have the right to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Mahan,* 971 S.W.2d 307, 314 (Mo. banc 1998). "Custodial interrogation" occurs either when a suspect is formally arrested or under any other circumstances where the suspect is deprived of his freedom of action in any significant way. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. Missouri courts analyze issues regarding the privilege against self-incrimination claimed under the Missouri Constitution in a manner consistent with analysis of those arising under the federal constitution. *State ex rel. Munn v. McKelvey,* 733 S.W.2d 765, 767 (Mo. banc 1987).

■■■ The fact that a person is a suspect does not trigger the duty to warn; there is no duty unless the suspect is also "in custody."

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. *Nor is the requirement of warnings to be imposed simply because the questioning takes place at the station house, or because the questioned person is one whom the police suspect.*

*Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (emphasis added).

■■■ Suspects are in custody when they have been informed that they are under arrest, or when restraints have been placed on them. When there is no declaration of arrest, and no physical restraint, the usual assumption is that a suspect is not in custody. However, there are fac-

tors that could potentially show that the police have *actually* taken custody of the suspect, even though there is no formal declaration of arrest and no handcuffs or other physical restraints placed on the suspect. *See, e.g., State v. Tally,* 153 S.W.3d 888 (Mo.App. S.D.2005) (suspect ordered around by officers while a police helicopter hovered nearby). In deciding whether a suspect is "in custody" at a particular time, courts examine the extent of the restraints placed on the suspect during the interrogation in light of whether a reasonable person in the suspect's position would have understood the situation to be one of custody. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Custody is determined by an examination of the totality of the circumstances. *State v. Werner,* 9 S.W.3d 590, 595 (Mo. banc 2000). The "totality of the circumstances cast" of the "in custody" determination, however, "does not mean deferential review is in order." *Thompson v. Keohane,* 516 U.S. 99, 113 n. 11, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *see also Miller v. Fenton,* 474 U.S. 104, 117, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

■■■ In reviewing motions to suppress based on an alleged failure to provide *Miranda* warnings, we examine questions of law de novo. *State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998). While factual issues on motions to suppress often are mixed questions of law and fact, *cf. State v. Higgins,* 592 S.W.2d 151, 157–58 (Mo. banc 1979); *State v. Rodgers,* 963 S.W.2d 725 (Mo.App.1998), the trial court's superior capacity to resolve credibility issues is not dispositive of the "in custody" inquiry. *Thompson,* 516 U.S. at 111, 116 S.Ct. 457. The question is treated as one of law. *Id.* at 115, 116 S.Ct. 457; *see also Yarborough v. Alvarado,* 541 U.S. 652, 654, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

### Deference

In this case, Brooks did not testify concerning her impressions of the interrogation. She testified only as to her personal background and circumstances, which are not disputed. Her opinions and impressions would not hold sway in this determination anyway because the U.S. Supreme Court has determined that the "in custody" determination is to be reviewed as a matter of law. *See, e.g., Thompson,* 516 U.S. at 111–15, 116 S.Ct. 457. This would mean that while credibility issues are resolved by the trial court, no deference is allowed the trial court as to the inferences to be drawn from the basic facts and the respective weight to be assigned to the various facts. *See id.* The objective test for custody has been held by the U.S. Supreme Court to be appropriate because, unlike a subjective test, it is "not dependent solely either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question." *Berkemer,* 468 U.S. at 442 n. 35, 104 S.Ct. 3138 (*quoting People v. P.,* 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255, 260 (1967)).

In this case, the basic historical facts are entirely captured on the videotape. There is also no dispute as to anything the officer said in the suppression hearing, except for the officer's self-serving opinions, which are irrelevant to an objective determination. *See id.* The motion hearing was devoid of dispute as to the "basic, primary, historical facts" of the case. *See Thompson,* 516 U.S. at 110, 116 S.Ct. 457. In view of all the foregoing, this clearly is a case in which the inferences drawn by the trial court shall not receive deference. Our review of the "in custody" determination in this case is a matter of law. *Id.; see Werner,* 9 S.W.3d at 595.

### "In Custody"

 The State does not dispute that Detective Rogers' questioning was "interrogation" within the meaning of the *Miranda* case; nor does the State need to show that Brooks was not a suspect. The State argues only, and needs only to persuade us, that this interrogation did not occur while Brooks was "in custody."

 *Miranda* warnings are required only where a person's freedom is restricted so as to render him in custody. *State v. Glass,* 136 S.W.3d 496, 511 (Mo. banc 2004). We look to the totality of the circumstances, including the accused's actual and perceived freedom to leave, and the purpose, location, and length of the interrogation. *See Werner,* 9 S.W.3d at 595 (*citing United States v. Griffin,* 922 F.2d 1343, 1348 (8th Cir.1990)). We also look to factors such as whether the suspect was informed that the questioning was voluntary, and whether the suspect was informed they were free to leave, or were not considered under arrest; whether the suspect actually possessed unrestrained freedom of movement; whether the suspect initiated the contact or voluntarily acquiesced to police requests for questioning; whether strong arm tactics or deception were employed; whether the atmosphere of questioning was police-dominated; and whether the suspect was placed under arrest at the end of questioning. *See id.* (*citing Griffin,* 922 F.2d at 1348). This list of factors is not exhaustive. *Id.* All of the pertinent factors must be considered in context. *Werner,* 9 S.W.3d at 598. As we have discussed, our determination is an objective one-whether a reasonable person in the suspect's position would have understood the situation to be one of custody. *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138.

The most recent decision of the Missouri Supreme Court illustrating this is *State v. Glass*, 136 S.W.3d 496 (Mo. banc 2004). In *Glass*, the defendant was suspected of having murdered the 13–year–old daughter of his former employer. The body was found unclothed at a campground. Among other factors suggesting possible involvement by defendant, a car like the defendant's car had been seen near the victim's house on the night of the apparent homicide. Two officers went to defendant Glass' home and asked to speak to the defendant. The defendant came outside to speak with them. The officer asked defendant if he had any information about the victim's disappearance. Defendant denied any knowledge. The officers asked him if he had been to her house. Defendant denied being at the victim's home and gave an account of his whereabouts the night before. They asked defendant Glass about the clothes he had been wearing the night before, and defendant said they were in the washing machine. They asked if he would show them the clothes, and he agreed to do so. One officer observed that there was mud on the clothes and sand on the bottom of the washing machine. The officers asked for and received consent to search the defendant's car. The officer observed what they believed were signs of a struggle on the hood and trunk of the car, including mud smears from fingers being dragged across the trunk. They asked Glass how he got mud on the car, and he responded that he did not know. The officer seized a pair of blue jeans from the back of the car, and seized some hair and what appeared to be blood on the car.

The officer asked defendant Glass to accompany him to the Sheriff's Department to give a written statement. Defendant agreed. The officers did not place Glass in handcuffs or place him under arrest. They took defendant Glass in one of the officer's cars because defendant's car was being searched. On the way to the station, they stopped so defendant could purchase cigarettes. At the station, defendant gave three statements over a period of hours. The first was not preceded by a *Miranda* warning. The second statement was given after a warning and waiver of rights. Glass was "not placed under arrest" prior to giving any of the statements. The first statement denied any knowing involvement, but the defendant stated he could have gone to the victim's house and did not remember because "he was so intoxicated." The two subsequent interviews, after the *Miranda* warnings, involved the officers extracting a confession from the defendant.

After a trial, Defendant Glass was convicted. On appeal, his first point asserted that the statements were the result of an illegal detention without probable cause. The second point asserted the statements should be suppressed because they were obtained as a result of custodial interrogation without first administering *Miranda* warnings. *Id.* at 508. Third, he argued the warned statements should be suppressed because they were obtained by using the unwarned statements.

The court quickly noted that the officers would have had probable cause to detain Glass. *Id.* at 508. The court next discussed the subject of the need to warn Defendant Glass of his *Miranda* rights. The court stated that a person who voluntarily accompanies officers to the police station for questioning is not subject to arrest-like restraints. *Id.* at 509. The court noted the following factors:

- The officers and Glass engaged in a voluntary discussion outside his home. *Id.*
- The officer asked Glass to go to the sheriff's office to give a written statement. Glass agreed. "Glass was not

placed in handcuffs or under arrest and was free to refuse." *Id.*

● The officers transported Glass because Glass' car was being searched and he had no other transportation. *Id.*

● Although two officers took him to the station, there was no evidence that the purpose of the two officers going with him together was for the purpose of restraining, threatening, or intimidating defendant into going to the station. *Id.*

● On the way to the station, Glass was allowed to go unattended into a convenience store to buy cigarettes. *Id.* During the interview, he was allowed food and breaks to go outside and smoke. *Id.*

● At no point did the officers show a weapon or physically or verbally restrain Glass in any way. *Id.* There was no "show of authority" causing Defendant Glass to submit. *Id.*

The Court concluded that a reasonable person in Glass' situation "would not have felt he was not free to leave during the first interview" with the officer. The court held that because defendant went voluntarily with the officers, he was not seized or detained. *Id.* at 510. The court said that there is "no evidence that this consensual encounter turned into a seizure prior to Glass making his second statement." The court said Glass' first written statement was admissible because Glass was *not* in custody prior to making it. *Id.* at 511.

In this case, it is clear that the commencement of the questioning was voluntary and that Brooks, like Glass, was willing to make a statement. Brooks had initiated the investigation by a 911 call. "When someone calls the police, that person should expect some sort of inquiry when the police arrive." *State v. Par-*

*tridge,* 122 S.W.3d 606, 610 (Mo.App.2003). There is no historical fact indicating, at least at the start of her communication with police, that Brooks viewed herself as being involuntarily detained by police. There was no restriction of her movement. There was no "show of authority." The only reason that she rode with the officer is that she had no other transportation. Also, it would be normal to assume that Brooks would have had a strong desire to appear cooperative with police and to have a plausible version of events. It was, after all, her cohabitant boyfriend's grandniece who had stopped breathing. It would certainly be normal in such a situation for a reasonable person to take into account her relationship to her boyfriend and her boyfriend's family in determining how cooperative to be in her interactions with the police.

There was no reason to conclude that she was being involuntarily detained. *See Glass,* 136 S.W.3d at 509. The State presented evidence that she agreed to go voluntarily, and there was no evidence to the contrary. A person who voluntarily accompanies officers to a police station for questioning is not subject to arrest-like restraints. *Id; see also State v. Feltrop,* 803 S.W.2d 1, 13 (Mo. banc 1991)(suspect voluntarily accompanied police to the station for interview).

Also, it is clear that "[a] person who is being asked preliminary, investigatory questions by the police is not in custody for the purpose of requiring a *Miranda* warning." *State v. Londagin,* 102 S.W.3d 46, 51 (Mo.App.2003); *State v. Middleton,* 854 S.W.2d 504, 511 (Mo.App.1993). The mere fact that an investigation has focused upon a person, and the police wish to interrogate that person, does not give rise to a warning requirement. *See Glass,* 136

S.W.3d at 509; *Middleton,* 854 S.W.2d at 513–14.

Next, we consider the circumstances at the station once the questioning was commenced. The State emphasizes that Detective Rogers informed Brooks at the beginning of the interview that she could stop talking anytime she wanted. Later, when Brooks was losing interest in continuing, the detective asked Brooks to continue in order to get the written statement accomplished that day. Brooks provides no authority for the proposition that efforts to persuade a suspect to grant or continue a thorough interview necessarily amount to the establishment of custody.

Brooks is correct that the officer never specifically declared to Brooks that she was *not* under arrest. The officer also never specifically offered, "would you like to leave now," or specifically said, "you can leave whenever you want to." The same thing was apparently true in *Glass.* *See Glass,* 136 S.W.3d at 509–510 (the Court, holding that the suspect was not in custody, did not mention any such comments by the police, though such comments would have been significant if they occurred). The circumstances in both cases, however, even without such comments, would indicate to a reasonable person that the suspect was not under arrest. *See id.* at 509. Here, the officer did inform Brooks that Brooks was free to tell her whenever Brooks did not "want to talk to [the officer] or whatever." This would be consistent with the notion that it was a voluntary interview. We are not shown any authority for the notion that a suspect is "in custody" merely because they are not expressly told in particular words that they can leave whenever they want to, in the absence of circumstances indicating some restraint. *Id.*

When Brooks said she was "tired of talking" and requested to go home to attend to her child, the detective again tried to persuade her to see the matter through to a finished interrogation. She obtained Brooks' consent to keep going. The facts suggest that a reasonable person would have believed she could have insisted on walking out if she were willing to take the risk that she would appear less than cooperative to police and to her boyfriend's family.

While from the inception Brooks was a suspect in the ordinary sense of that word, the fact that she was a suspect and that the detective hoped to elicit a confession if there were foul play does not mean that she was "in custody." *Middleton,* 854 S.W.2d at 513–14.

> A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; *the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.*

*Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138 (emphasis added). Thus, it is actual custodial interrogation, and not the fact that a person is a suspect, or that the police hope or plan to obtain a confession, that gives rise to the duty to warn. *See Glass,* 136 S.W.3d at 509.

Brooks, in her brief, does not discuss *Glass,* and instead relies upon another Missouri Supreme Court case dealing with the in-custody determination, *State v. Werner,* 9 S.W.3d 590 (Mo. banc 2000). In that case, the court determined that the unwarned interrogation was custodial, and that suppression was required under the constitution. There, police officers suspected Jeremy Werner, a sixteen-year-old, in connection with the homicide of Werner's two-year-old nephew. Three detectives went to the school where the suspect and his sister attended. Without having notified Werner's mother, the police re-

moved him from school in the middle of the school morning, signing a form indicating that they were taking "custody" of Werner and his sister, and "accepting responsibility" for their care and custody. The detectives informed Werner that they were investigating the death and wanted to talk to him and his sister. Werner, in addition to being a juvenile, was of sub-average intelligence and functioned at a fourth grade level. Werner did not purport to object. The police separated him from his sister, and transported them in separate cars to the police station, and then took them to separate interview rooms, where they each waited alone. Police waited two hours before questioning the juvenile. When he requested to use the restroom, officers "escorted" him to the restroom. Two officers then questioned Werner about the homicide for one hour. Werner admitted that he had squeezed and choked his nephew. The detectives located Werner's mother and notified her that Werner was being held at the police station. Upon the arrival of the mother, police informed Werner of his *Miranda* rights.

The court held that the officers had seized Werner at the school. The assistant principal who delivered Werner to the officers at the school testified that in his mind there was "no question" that the police were going to take Werner to the station. *Id.* at 596. Werner was isolated and made to wait for an interrogation. Once the questioning began, Werner "lacked control over the interview process." *Id.* at 596. Two officers were interrogating him. The atmosphere was police dominated. He was not informed that he could leave, and was not informed that he could refuse to answer questions. The court looked for any objective evidence indicating that Werner could leave. The court found no such evidence. *Id.* at 598. It was patent that Werner was in custody.

Werner had been transferred from the authority and control of the school directly to the custody of the officers without parental knowledge or approval. There is no indication that school officials believed they had any right to object. Werner was not even allowed to use the bathroom at the station without being "escorted." The court held that the police violated Werner's Fifth and Fourth Amendment rights, applicable through the Fourteenth Amendment, by illegally placing him in custody and detaining him without probable cause. *Id.* at 600. The court held the statements made to police must be suppressed.

*Werner* is, of course, distinguishable in that it involved a juvenile, not an adult. The Court in *Werner* stated "that a custody determination should take into account all the circumstances, including the suspect's personal background experience, familiarity with police questioning, maturity, education and intelligence." *Id.* at 598. This proposition is applicable to a case involving the circumstances present in *Werner.* The statement is not repeated in *Glass,* where the court simply applied an objective test to an adult. The U.S. Supreme Court has indicated that, generally, the objective test does not "place on the police the burden of anticipating the frailties or idiosyncracies of every person they question." *Berkemer,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317; see also *Yarborough v. Alvarado,* 541 U.S. 652, 654, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). In *Werner,* there was no objective indication that Werner had freedom to leave at any time. The fact that Werner may have purported to acquiesce meant nothing in the circumstances, as he was an immature juvenile whose parents had not even been notified.

Brooks also relies on *State v. Tally,* 153 S.W.3d 888 (Mo.App. S.D.2005). In *Tally,* officers in a helicopter observed a suspect,

Tally, standing between two patches of cultivated marijuana plants. The officers, by gesture, ordered the suspect to walk toward the house on the property. He complied. Another officer on the ground then approached and ordered the man to get on his knees and raise his arms. The suspect asked the officer if he was under arrest. The officer told him that "at that time" he was not under arrest. *Id.* at 891. With the helicopter hovering nearby and several officers in the area, the officer then engaged the suspect in a discussion of "box cameras" in order to imply that such concealed cameras had been installed in the field and had taken pictures of him. Although this tactic was merely a ruse, the suspect immediately confessed that the plants were for his own personal use.

In *Tally*, the court noted that the police in the helicopter had restricted the suspect's movement. Because of the way the officers began ordering the suspect about, and because of the presence of officers on the ground, with the helicopter hovering a short distance away, the court concluded that the appellant would not have felt that he was free to leave, despite the earlier disclaimer that "at that point" he was not under arrest. *Id.* at 894–895.[4] *Tally* illustrates that a show of force and exercise of authority to restrain a suspect can be more important than a declaration that the suspect is not under arrest. *Tally* shares with *Werner* the fact that in both cases the police were clearly restricting the movements of the suspects.[5]

A case that is somewhat like *Glass*, but decided earlier, is *State v. Middleton*, 854 S.W.2d 504 (Mo.App. W.D.1993). In that case the defendant dialed 911 to request an ambulance and to report that a gun had just "gone off" and hit his wife in the head. An officer arrived promptly at the residence, finding the defendant frantic, and also finding Mrs. Middleton's body was in the house. The officer asked Middleton questions to try to determine what had happened. *Id.* at 507. Middleton said that his wife had dropped a .357 magnum and the gun went off. *Id.* Paramedics determined the defendant was hyperventilating, complaining of chest pains, and his blood pressure was elevated. *Id.* They convinced the defendant to allow them to transport him to the hospital for an examination. *Id.* One officer rode in the ambulance with the defendant and again asked him to be clear "as to what exactly had happened." The defendant began to talk but then began to feign unconsciousness. *Id.* at 508.

At the hospital, after defendant was acting conscious, and began to interact with hospital personnel, the police officer went into the room, and the defendant agreed to resume describing the events of the day. He then made statements about what had transpired. *Id.* The defendant was not formally arrested nor was he advised of his *Miranda* rights. *Id.* At trial, the evidence of the defendant's conduct and his statements, including the statement at the hospital, were admitted into evidence against

---

**4.** The court also opined that the use of the ruse about the box cameras was not the normal type of investigative question employed by officers when a person is not in custody. *Tally*, 153 S.W.3d at 895. It is not clear how the court reached that conclusion, or how integral to the court's holding that perception was.

**5.** Some of the pre-*Glass* cases, such as *State v. Zancauske*, 804 S.W.2d 851 (Mo.App. S.D. 1991), are not helpful because of applying an incorrect standard of review to the "in custody" determinations. The court in *Zancauske* unfortunately reviewed the matter by taking all facts and inferences in a light favorable to the decision of the trial court. *Id.* at 852–53. Thus, the trial court ruling suppressing a statement was affirmed.

him. *Id.* The defendant, who was convicted, maintained that the trial court erred in refusing to suppress the statements because the officers failed to advise him of his *Miranda* rights. The court in *Middleton* held that Middleton was not in custody at the time of the questioning at the house or in the hospital. *Id.* at 512. The defendant was not "at the mercy of the officer," nor was he "deprived of his freedom of action to any degree by the police officer." *Id.* The "aspects of a custodial interrogation were not present." *Id.*

The court in *Middleton* also rejected the notion that the police were required to give *Miranda* warnings simply because "their investigation had focused on the suspect." The court dealt extensively with this issue, explicitly rejecting it. *Id.* at 513–14. Quoting *Berkemer*, 468 U.S. at 435, 104 S.Ct. 3138, the court reiterated the language that "the threat to a citizen's fifth amendment right that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions." *Id.* at 515. The court held that because the defendant was not in police custody and was not subjected to arrest-like restraints, the trial court did not err in permitting the testimony relating to the defendant's hospital statements. *Id.*

Brooks, like Middleton, initiated the contact with authorities by a 911 call, and agreed voluntarily to make a statement about what had happened. *See Middleton,* 854 S.W.2d at 508. In *Middleton,* although paramedics took him, with his consent, to the hospital, Middleton was free to leave if he had chosen to do so. *Id.* at 512. He agreed, when asked, to talk to the detective. *Id.* In our case, Brooks also agreed to talk, and each time agreed to continue the interview. Brooks, like Middleton, and like the defendant in *Glass,* did not have her own transportation, but lacking one's own transportation is not necessarily tantamount to being under arrest or being restricted by police directive as in *Tally.* We conclude that the cases relied upon by Brooks do not warrant affirming the trial court in total.

In this case, as in *Middleton,* the detective could have advised Brooks of her rights when the detective first asked Brooks to come to the station, while also informing her that she was not under arrest. There would have been nothing wrong with that; it might have been practically shrewd as well as legally appropriate. *See State v. Reese,* 26 S.W.3d 323, 324 (Mo.App. E.D.2000) (suggesting that it would be prudent to inform individuals going to the station for interview either that they are free to leave when they want, or else provide *Miranda* warnings). However, the constitution did not *require* the detective to specifically advise Brooks of her status when Brooks was, for all appearances, voluntarily accompanying the officer to the station as a helpful citizen, and voluntarily agreeing to describe the events of that day. *See Glass,* 136 S.W.3d at 509; *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. 711.

The *Miranda* decision was intended to apply only to custodial interrogation, and not to the kind of interrogation where the police are engaged in an investigation of something that may or may not be foul play.

Our decision is not intended to hamper the traditional function of police officers in investigating crime ... general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. *It is an act of responsible citizenship for individuals to give what information they may have to aid in law enforcement.*

*Miranda,* 384 U.S. at 477–78, 86 S.Ct. 1602 (emphasis added).

We conclude that Brooks was not in custody when she accompanied the officer to the station. She had initiated the contact with the officers as a citizen. She had good reason to voluntarily make a statement. It was a normal police investigation of the circumstances of the fact that the baby had stopped breathing. Brooks acquiesced in the entreaties to complete the statement. Until the formal statement was completed, she had no reason to think anything other than that she was being a good citizen voluntarily giving a statement to the police so they could proceed with their investigation and she could appear cooperative. The trial court erred as a matter of law in holding that Brooks was in custody throughout the time she was at the police station. *See Glass,* 136 S.W.3d at 509.

### From Non–Custodial to Custodial

That determination does not end our inquiry, however. Of course, an interrogation can change from a non-custodial interrogation to a custodial interrogation. Here, after completing the written and audiotaped statements, the detective, after *repositioning herself so that she was directly in front of Brooks,* looking directly into her face from a short distance away, said they would leave "after this." The officer did not allow a response from Brooks, but proceeded with a series of admonitions and probings, disregarding the obvious issue of whether Brooks, after all that had transpired, was willing to stay longer. The officer's disregard of that issue would have been noticed by any reasonable person in the shoes of Brooks. Previously, the detective had always solicited Brooks' consent to continue with the interview, as though acknowledging that Brooks had some say in the matter and was not entirely "at the mercy of" the

detective. The question then is whether, at that point, the officer was effectively ordering Brooks to stay until "after this." And the next question is whether, if that is true, such order converted a non-custodial interrogation into a custodial one.

### Allocation of Burden

We have no case directly on point as to the change of the interrogation—only the principles drawn from the cases discussed above. We also note that the State has the burden of showing, as a matter of law, that even after the officer took control of the continuation of the interview, a reasonable person would have still believed she was free to leave. *See State v. Hoopingarner,* 845 S.W.2d 89, 92 (Mo.App. E.D.1993) (State has burden of showing admissibility of statement on motion to suppress). The allocation of the burden is not without significance in this case. From *Glass,* it is clear as a matter of law that the three initial stages of Brooks' interrogation were not custodial. The stage we have chosen to call the fourth stage of Brooks' interrogation, however, was not like the first statement (the unwarned statement) made by the defendant in the *Glass* interrogation.

In *Glass,* there was no constitutional problem, because the first statement was given in a non-custodial interrogation, and the officers provided *Miranda* warnings to Glass after the first statement and before attempting to extract the confession. Here, no warning was given before the officer arguably restricted Brooks' freedom and secured a key admission. At trial, in describing her interview technique, the officer testified that she normally conducted her interviews in the three stages mentioned above, with the written and audio recorded statement being the third stage. The officer did not comment at

trial on the purpose of taking this interview beyond those three stages to what we have referred to herein as the "fourth" stage.

We conclude, for the following reasons, that the interrogation changed to custodial when the interview entered the fourth stage, which occurred when officer restricted Brooks' freedom by saying, "Now I just want to ... I promise we'll leave after this." We look to the fact that Brooks, who had been at the station several hours, had already voluntarily provided extensive statements. Then, after having been informed that the statements were concluded, when she no doubt expected to be released, she was essentially *told* (not asked) to remain still longer, with the promise that "after this" she could leave. The officer, without explanation, divested Brooks of any control she had previously had of the interview process. The reasonable import of what the officer said was *not*, "Well, of course, you are still free to leave on your own, but I would be glad if you would agree to wait and allow me to tell you a few things and ask some more questions, and then when we are finished, we will leave." We believe instead the reasonable import was, "I am going to keep you here longer, but I promise you that when I am through with this you can go home." In other words, "you cannot leave now, but later (when I say so) we will leave." Because Brooks was given no opportunity to know what "this" was or how long "this" would take, and because the officer purposely avoided discussion about the purpose or the length of the next stage of the interview, the officer's statements left Brooks at the officer's mercy. *See Werner*, 9 S.W.3d at 596.

The fact that there remained a promise that Brooks could leave at some unknown point does not alter the fact that a reasonable person in those circumstances, after all that had transpired, would understand that she was restricted by the officer's comments. Nor do we know, in retrospect, if Brooks had been slower to confess, how long the officer would have detained her to address her with monologues (alternating between sympathy and accusation) and probe her with questions until she finally gave in.

We reach this conclusion in view of the particular facts of this case, including all of the objective circumstances mentioned above. A somewhat similar statement in a different context might not necessarily equate to the establishment of custody for warning purposes. In this case, however, we cannot say that the circuit court's ruling was erroneous to the extent that it suppressed anything Brooks said in the fourth stage of the interrogation. The State's point is denied as to the statements made by Brooks after the detective kept Brooks detained for "this." All questioning, all accusations, and all responses by Brooks made in the fourth stage of the interrogation were properly suppressed.

### Post–Miranda Statements

The State contends that even if this court concludes that some or all of Brooks' pre-*Miranda* admissions were properly suppressed because she was in custody when she made them, we still must find that her post-*Miranda* statements made in the "fifth stage" (the warned stage) are admissible.

We start our analysis of this issue by noting that Brooks was never asked if she were *willing to waive* her rights and to talk about the circumstances. Rather, she was asked only if she *understood* her rights. Then, she was asked to sign to

indicate that *she understood.*[6] The detective then immediately asked her to verify what she had said before she was warned. Although Brooks seemed willing to continue to talk, it is highly doubtful, at that point, that any reasonable person would have understood that some or all of her unwarned statements might not be admissible. Thus, it is unlikely that she had any awareness she could exercise the right to retract anything.

The State relies on *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), for the proposition that admissibility of a post-*Miranda* statement "should turn ... solely on whether it [was] knowingly and voluntarily made." In *Elstad,* a pre-*Miranda* admission was obtained at the defendant's home when the police arrived to make an arrest. *Id.* at 301, 105 S.Ct. 1285. The State conceded that the defendant was in custody at the time. The court suppressed the statement. *Id.* at 302, 105 S.Ct. 1285. The defendant's post-*Miranda* confession, which was obtained later at the police station, was held to be admissible. *Id.* at 301, 318, 105 S.Ct. 1285.[7]

We find *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), more analogous to this case. In *Seibert,* the suspect was arrested and taken to the police station where she was interrogated for thirty to forty minutes. *Id.* at 604–05, 124 S.Ct. 2601. The police deliberately withheld *Miranda* warnings during this first stage of questioning. *Id.* at 605, 124 S.Ct. 2601. The suspect confessed to crimes amounting to second-degree murder. *Id.* The police then gave her a

twenty-minute break. *Id.* When the police returned, they turned on a tape recorder, obtained a *Miranda* waiver, and resumed questioning. *Id.* At this time, they confronted the suspect with her previous statement, and she repeated the incriminating information. *Id.* The United States Supreme Court criticized this "question-first" or "two-stage" method of questioning as an attempt to "thwart" the purpose of *Miranda.* *Id.* at 608–09, 124 S.Ct. 2601. The Court held that the suspect's post-warning statements were inadmissible. *Id.* at 617, 124 S.Ct. 2601.

Distinguishing *Elstad,* the *Seibert* Court noted that since a reasonable person in Elstad's situation, "could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Seibert,* 542 U.S. at 615–16, 124 S.Ct. 2601. That was not true in *Seibert,* where the post-warning questioning proceeded after a pause of only fifteen to twenty minutes and was conducted in the same place as the unwarned segment and by the same officer to whom she had already confessed. *Id.* at 616–17, 124 S.Ct. 2601. Under those circumstances, "a reasonable person ... would not have understood ... that she retained a choice about continuing to talk." *Id.* at 617, 124 S.Ct. 2601.

The *Seibert* Court identified a series of factors to be considered in determining whether *Miranda* warnings delivered mid-questioning, and after an unwarned confession has been obtained, can effectively

---

**6.** The form Brooks signed was not a *Miranda waiver* form. It was a *Miranda acknowledgement* form.

**7.** The State also relies on *State v. Glass,* 136 S.W.3d 496 (Mo. banc 2004). We find that case to be inapposite on this issue, however.

There, as noted earlier, the defendant's pre-*Miranda* statements were *properly* admitted, and his post-*Miranda* statement was held to be admissible primarily on that basis. *Id.* at 511.

achieve their purpose. Those factors include:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615, 124 S.Ct. 2601.

Here, the first three rounds of pre-warning questions and answers went into great detail. As in *Seibert,* there was virtually no break between the unwarned questioning and the post-*Miranda* interrogation. Both were conducted in the same setting and by the same officer. There was a clear overlapping of the content of the pre-warned and post-*Miranda* statements, and the officer treated the second round of questioning as continuous with the first. Immediately after Brooks signed the *Miranda* acknowledgment form, Detective Rogers said: "Now tell me what happened ... *cause what you were telling me* ... is everything you're telling what happened the truth ... or do we need to go over it again?" The officer did not ask Brooks if she were willing to waive her rights and continue to talk. We cannot conclude from this that a reasonable person of Brooks' inexperience and in Brooks' circumstances would have understood that she retained a real choice about continuing to talk at that point. *See also State v. Fakes,* 51 S.W.3d 24, 34–35 (Mo. App.2001). Consequently, it cannot be said that the motion court clearly erred in suppressing the post-*Miranda* statements.

## Conclusion

The law imposes on the State the burden of demonstrating that pre-*Miranda* admissions made by Brooks in this interrogation should be allowed into evidence because there was no violation of *Miranda* in that Brooks was not in custody until *after* she admitted guilt; and, thus, there was no custodial interrogation. We believe the State did successfully show that the earlier parts of the interrogation—including the first three stages—were not custodial. However, for the reasons stated above, we conclude that the State did not show that the detective timely warned Brooks of her *Miranda* rights before a reasonable person in Brooks' circumstances would have perceived she was "in custody."

The State also had the burden of demonstrating that the post-*Miranda* admissions should not be suppressed because they were sufficiently independent of admissions made before she was advised of her rights while in custody. Brooks again did not have the burden of proof; that burden rested on the State.

After taking into account the burden of proof and all of the foregoing factors, we determine that that part of the interrogation which took place before the fourth stage of the interrogation did not constitute custodial interrogation and is not subject to suppression on *Miranda* grounds. We hold that all incriminating statements made in the interrogation thereafter, including the statements made after the *Miranda* warnings were given, were properly ordered suppressed. Thus, we affirm in part and reverse in part, remanding the case for further proceedings.

HOWARD and NEWTON, JJ., concur.