STATE of Missouri, Plaintiff–
Respondent,

v.

John TALLY, Defendant–Appellant.

No. 25710.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 26, 2005.

Irene Karns, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, for respondent.

PHILLIP R. GARRISON, Judge.

On April 29, 2004, this court issued an opinion in this case. On August 24, 2004, by order of the Supreme Court of Missouri, this cause was transferred to that court. On December 21, 2004, the Supreme Court entered an order retransferring the cause to this court. The original opinion of this court, which follows, is now readopted and reissued.

John Tally ("Appellant") was charged as a prior and persistent offender with one count of production of a controlled substance, a violation of Section 195.211.[1] Following trial by jury, he was found guilty and sentenced by the trial court, as a prior and persistent offender, to fifteen years imprisonment. In a single point on appeal, Appellant alleges it was prejudicial error for the trial court to overrule his motion to suppress an incriminating statement he made to law enforcement authorities during what Appellant contends was a custodial interrogation. We agree, and must therefore reverse the judgment appealed from and remand for new trial.

## I. Statement of Facts

Appellant does not contest the sufficiency of the evidence supporting his conviction. Viewed in the light most favorable to the verdict and the trial court's ruling on Appellant's motion to suppress, State v. Rousan, 961 S.W.2d 831, 845 (Mo. banc), cert. denied, 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998), the evidence revealed the following: on September 2, 2002, Rick Hamilton ("Hamilton") and Eugene Wood ("Wood"), both of the Webster County, Missouri sheriff's department, and Alva Thurman "(Thurman"), of the Missouri State Highway Patrol, were engaged in a marijuana eradication effort in Webster County. Their efforts involved the use of a highway patrol helicopter, flown by Thurman, and in which Wood also rode, and communication with Hamilton, who was nearby in his patrol car.

Pursuant to a tip the officers had received, they focused their search on the property of Joe Horman ("Horman") near Marshfield, Missouri. In a field behind Horman's house, Thurman and Wood observed what appeared to be two cultivated patches of marijuana plants approximately 150 yards apart. They informed Hamilton by radio of the find, and Hamilton went to the door of Horman's home to ask him about the plants.

Meanwhile, Thurman and Wood spotted Appellant standing between the two marijuana patches, approximately fifty yards from one and one hundred yards from the other, and looking up at the helicopter. There was no evidence that Appellant had just been tending to the plants. Thurman brought the helicopter closer to Appellant and made a gesture to him indicating that he was to walk toward Horman's house. Appellant complied, and Thurman and Wood followed him in the helicopter toward the house.

When Hamilton was informed by radio of Appellant's presence in the field, and that he was walking toward the house, he sought and received Horman's permission

1. References to statutes are to RSMo (2000) unless otherwise indicated.

to enter the field to meet Appellant. Hamilton was unarmed and not in uniform; thus, out of concern for his safety, he ordered Appellant to get on his knees and raise his arms to expose his waistband, in order that Hamilton could determine if Appellant was armed. He was not.

There is considerable dispute in the record concerning whether Appellant was immediately allowed to stand up and walk to where Hamilton was standing, as Hamilton testified, or if, instead, Appellant was forced to stay on his knees during his subsequent conversation with Hamilton, as testified to by Wood, Horman, and Appellant. In any event, Hamilton next told Appellant that marijuana had been spotted growing in the field Appellant had just left. Appellant denied any knowledge of the plants, telling Hamilton that he had been in the field looking for rocks, with Horman's permission.[2] Appellant asked Hamilton if he was under arrest, and Hamilton told him that, at that time, he was not.

Hamilton then asked Appellant if he was familiar with "box cameras." Appellant said he was not, and Hamilton replied that a box camera was a concealed video camera that enabled authorities to record any activity around locations such as the marijuana patches in Horman's field. In fact, no such device had been installed in the field. Unaware of that fact, Appellant immediately confessed to Hamilton that the plants in the field were for his personal use. Wood testified that it was at this point in the conversation that he approached Appellant from behind, after Thurman landed the helicopter a short distance from Appellant and Hamilton. Hamilton instructed Wood to arrest Appellant, who was then handcuffed and read his Miranda rights as he was led to Hamil-

ton's patrol vehicle. The plants in the field were removed and sent to a highway patrol laboratory, where testing confirmed they were marijuana plants, and that the leaves thereof weighed 387 grams.

Appellant was charged as indicated above in the circuit court of Webster County. Following change of venue to Dallas County, Appellant filed a motion to suppress the incriminating statement he made to Hamilton prior to being arrested and Mirandized, claiming the statement was the result of an improper custodial interrogation. Following a hearing, the trial court denied Appellant's motion. Appellant's subsequent trial resulted in a mistrial. He was tried a second time and convicted and sentenced, as a prior and persistent offender, as indicated above. This appeal follows.

## II. Appellant's Point Relied On

In his sole point on appeal, Appellant contends that the trial court erred in overruling his motion to suppress his statement acknowledging that the marijuana plants belonged to him, and admitting that statement into evidence at trial over his objection. Appellant argues that the statement was "presumptively coerced" and inadmissible in that it was elicited during a custodial interrogation prior to which Appellant had not been informed of his rights to assistance of counsel and protection from compelled self-incrimination. Admission of the statement was prejudicial, according to Appellant, because the evidence was otherwise insufficient to support a finding of guilt.

## III. Standard of Review

▮ In reviewing a claim of error relating to a trial court's ruling on a motion

---

2. That Appellant had such permission in advance was confirmed by Horman in his testimony.

to suppress, "[t]he correctness of the trial court's decision is measured by whether the evidence is sufficient to sustain the findings." *State v. Donnell,* 849 S.W.2d 733, 733 (Mo.App. S.D.1993). In answering this question, "the facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded." *State v. Galazin,* 58 S.W.3d 500, 507 (Mo. banc 2001). "Deference is given to the trial court's superior opportunity to determine the credibility of witnesses." *Rousan* at 845. When, however, the issue to be decided involves the constitutional protection against forced self-incrimination, our review of the trial court's ruling is a two-part inquiry: we defer to the trial court's determinations of witness credibility and findings of fact, but consider the court's conclusions of law *de novo. State v. Werner,* 9 S.W.3d 590, 595 (Mo. banc 2000). Moreover, "[f]actual issues on motions to suppress are mixed questions of law and fact" and " 'the trial court's superior capacity to resolve credibility issues is not dispositive of the "in custody" inquiry' " *Id.* (quoting *Thompson v. Keohane,* 516 U.S. 99, 113, 116 S.Ct. 457, 465, 133 L.Ed.2d 383, 394–95 (1995)).

## IV. Analysis

### A. Legal Background

■ The Fifth Amendment to the United States Constitution states, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This provision is applicable to the States in all criminal prosecutions. *Dickerson v. United States,* 530 U.S. 428, 432, 120 S.Ct. 2326, 2329–30, 147 L.Ed.2d 405, 412 (2000). Moreover, protection against self-incrimination under the Missouri Constitution is commensurate with that provided in the federal constitution. *Werner* at 595, Mo. CONST. art. I, § 19.

■ In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court of the United States held that custodial interrogation by police must not occur prior to a suspect being informed of his right to assistance of counsel and his right against self-incrimination. *Id.* at 444, 86 S.Ct. 1602. By "custodial interrogation," the Court "mean[t] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* In such a context, statements of a suspect, whether exculpatory or inculpatory, are inadmissible on the issue of the defendant's guilt of the charged offense when made without the benefit of having been informed of his rights under the Fifth Amendment. *Id.* Whether Appellant was in custody when he made incriminating statements to Hamilton becomes, therefore, the threshold question in our analysis of Appellant's point.

### B. Was Appellant in Custody?

■ As indicated above, the *Miranda* Court defined custody as either formal arrest or circumstances in which a suspect is "deprived of his freedom of action in any significant way." *Miranda* at 444, 86 S.Ct. 1602. In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Court clarified this definition when it noted the by-then "settled" doctrine "that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " *Id.* at 440, 86 S.Ct. 1602 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983)). In reviewing for the presence of custody as so defined, a reviewing court is to apply an

objective standard, in that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 86 S.Ct. 1602; *see also Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 298 (1994); *Werner* at 595.

The landscape of Missouri law on the issue of custody was brought into sharp focus by the court's analysis in *Werner.* There, the Supreme Court of Missouri applied a six-part test, previously enunciated in *United States v. Griffin,* 922 F.2d 1343 (8th Cir.1990), to a case in which a mentally handicapped sixteen-year-old boy was removed from his high school class by detectives, transported to a police station, and questioned concerning the suffocation death of the boy's twenty-two-month-old nephew. *Id.* at 593. In holding unanimously that the boy was subjected to un-Mirandized custodial interrogation, the court noted generally that the reasonableness of a suspect's belief that he is in custody is determined by considering the "totality of the circumstances" in view of the suspect's "freedom to leave the scene," as well as the "purpose, place, and length" of any interrogation that occurs while the suspect allegedly is in custody. *Werner* at 595 (citing *Griffin* at 1348). The court recited with approval six other "indicia of custody" from *Griffin,* including

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to answer questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere was police dominated; or,

(6) whether the suspects was placed under arrest at the termination of questioning.

*Id.* at 595 (quoting *Griffin* at 1349).

The *Werner* court cautioned that this list is "not exhaustive," *Id.* (citing *Maine v. Thibodeau,* 475 U.S. 1144, 1146, 106 S.Ct. 1799, 1800–01, 90 L.Ed.2d 343, 345–46 (1986) (Burger, C.J., dissenting)), adding that in "examining the totality of the circumstances, courts may also consider an individual's personal background, experience, familiarity with police questioning, maturity, education, and intelligence." *Id.* at 595–96 (citing *United States v. Zahrey,* 963 F.Supp. 1273, 1278 (E.D.N.Y.1997)). The *Werner* court went on to state that

[a]lthough determining custody is not limited to applying the factors listed above, their presence and absence guide courts in assessing the totality of the circumstances surrounding interrogations. With regard to the first three *Griffin* factors, the affirmative presence of one or more of them during questioning "would tend to mitigate the existence of custody at the time of questioning." The affirmative presence of the last three *Griffin* factors would "tend to aggravate the existence of custody." It is not necessary that all of the foregoing indicia be present to find custody. "A particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors."

*Id.* at 596 (internal citations omitted).

### 1. Application of *Werner* and *Griffin* to Instant Case

■ Applying the so-called "*Griffin* factors" cited by the court in *Werner,* we

find that Appellant was in custody at the time he gave to Hamilton the incriminating statement that he argues should have been suppressed by the trial court.

(1) As to the first of the *"Griffin* factors," we acknowledge with the *Werner* court that "[t]he most 'obvious and effective means by which the police can demonstrate that a suspect has not been taken into custody' is for the police to inform the individual that he or she is not under arrest and that the individual can terminate the interview at will." *Werner* at 596 (quoting *Griffin* at 1349). "[T]he absence of police advisement that [a] suspect is not under arrest, or that the suspect is at liberty to decline to answer questions, has been identified as an important indicium of the existence of a custodial setting." *Griffin* at 1350. Conversely, where officers have issued such an advisement, custody has frequently been found not to exist. *Id.*

Here, Appellant asked Hamilton if he was under arrest, to which Hamilton responded, "Not at this time." Indeed, this constitutes the strongest evidence that Appellant was not in custody when he admitted to Hamilton that the marijuana plants belonged to him. However, Hamilton at no time informed Appellant that he could terminate the conversation with Hamilton at will, mitigating somewhat any inference to be drawn from the fact that Hamilton told Appellant he was not under arrest.

▋ (2) Concerning the second *"Griffin* factor," the *Werner* court noted that "[r]estraint on a suspect's freedom of movement during questioning bears on whether a court will find that a suspect was in custody." *Id* at 596. Suspects often are escorted or chaperoned during questioning for reasons unrelated to custody, but "the relevant inquiry is the effect on the suspect.... [T]he likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials" is associated with the restraints of a formal arrest and tends to support the existence of custody. *Griffin* at 1350–51.

In this case, Appellant was ordered by Thurman, who was piloting the helicopter, to walk toward Horman's house, where he was met by Hamilton and ordered to his knees. If the trial court believed the testimony of Horman, Appellant, and Wood that Appellant remained on his knees throughout the ensuing conversation, the question posed under this second factor would be considerably less debatable. Given, however, the applicable standard of review, we assume the trial court believed the testimony of Hamilton, who stated that Appellant was allowed to stand immediately after Hamilton determined he was not armed. Even so, the presence of Hamilton, Wood, Thurman, and the helicopter, which was either hovering overhead or on the ground a short distance away during Hamilton's questioning, suggests to us that a reasonable person in Appellant's position would not have felt that he enjoyed unrestrained freedom of movement.

▋ (3) "The method used to summon the individual is another factor courts consider in determining whether a suspect is 'in custody.'" *Werner* at 597. " '[W]en [a] confrontation between [a] suspect and the criminal justice system is instigated at the direction of law enforcement officers, rather than the suspect, custody is more likely to exist.'" *Id.* (quoting *Griffin* at 1351). "Mere acquiescence to an official's request to answer questions does not indicate that an individual voluntarily is talking with police and not in custody." *Id.; see United States v. Chamberlain,* 163 F.3d 499, 504 (8th Cir.1998) (inmate who appeared for interview at request of corrections official did not do so voluntarily because he reasonably could have believed that if he did not answer questions, he

would have been in violation of prison rules).

Applying this factor to the case *sub judice*, there can be little doubt that the conversation between Appellant and law enforcement was initiated at the behest of the latter. He was approached first by officers in a helicopter, then by a deputy who ordered him to the ground and began asking him questions. The encounter between Appellant and the officers was not consensual, adding further weight to the notion that he was in custody.

■■■ (4) The fourth factor listed in *Werner* and *Griffin* addresses whether police employed strong-arm tactics or deceptive stratagems. "It goes without saying that a strong presumption of impropriety attaches to any circumstances where this [c]ourt detects the use of coercive interrogation techniques to obtain confessions." *Griffin* at 1351. Certainly, the use of deception in obtaining a confession from a suspect has been accepted as a viable tool of the interrogator in the custodial setting; that they are so often effective was, however, a powerful impetus for the *Miranda* decision itself. *See Miranda* at 466, 86 S.Ct. 1602.

The record before us clearly indicates that Hamilton employed deceptive tactics in obtaining Appellant's incriminating statement. Indeed, Hamilton admitted as much in his testimony, where he described the purpose of his "box camera" line of questioning as an attempt to convince a suspect "that there is evidence against him, to make a person who's normally lying to go ahead and—and tell the truth." Considering the totality of the circumstances, we deem this fact a particularly strong indication that Appellant was in custody when he made his confession to Hamilton.

■■■ (5) As to the fifth factor enunciated in *Griffin* and *Werner*, questioning that occurs in an atmosphere dominated by the police "is more likely to be viewed as custodial than [questioning] which does not." *Griffin* at 1352. "Where the conduct of the police leads a suspect to believe that the police have taken full control of the scene," a court is more likely to recognize the existence of custody. *Id.*

Here, it seems unlikely that Appellant could reasonably have believed anything other than that the setting in which Hamilton questioned him was police dominated. Again, Appellant was at all times surrounded by three officers, one of whom was either flying a police helicopter overhead or landing the helicopter a short distance behind Appellant. We find unconvincing the argument that Horman's presence on the scene mitigated in any significant way the control exercised by the three officers over the scene and Appellant.

(6) The sixth and final indicium of custody listed in *Griffin* and *Werner* is whether the suspect was placed under arrest at the termination of questioning. *Griffin* at 1349. In this case, Appellant was arrested by Wood immediately after making the incriminating statement to Hamilton.

■■■ When assessing the totality of the circumstances, a court also may consider an individual's personal background, experience, familiarity with police questioning, maturity, education, and intelligence. *Zahrey* at 1278. In this regard, the State argues that Appellant's "prior and persistent offender" status necessarily indicates that Appellant was aware of police interrogation procedure. The record, however, does not provide a sufficient basis for assuming that Appellant's prior encounters with the legal system included custodial interrogation, or that he was otherwise familiarized with Fifth Amendment juris-

prudence concerning custodial interrogation. Moreover, even if the record did contain such evidence, Appellant's awareness of police procedure would not, given the totality of the circumstances presented here, be so impressive as to compel a finding that Appellant was not subjected to un-Mirandized custodial interrogation.

## 2. The State's *"Terry* stop" Argument

The State, in its brief, makes no reference to the six-part test established by *Griffin* and *Werner,* bottoming its argument, instead, on a contention that the questioning of Appellant was part of "nothing more than an ordinary *'Terry* stop'" and that, therefore, the strictures of *Miranda* did not apply to Appellant's statements to Hamilton. We are not persuaded that this *"Terry* exception" to *Miranda* applies here.[3]

The Supreme Court, in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. 1868. As for what set of circumstances warrant such an intrusion based on less than probable cause, the Court held that an officer may briefly detain and search an individual if there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer* at 439, 104 S.Ct. 3138. That the dictates of *Miranda* do not apply in the context of a valid *"Terry* stop" was established in *Berkemer,* where the Court held that "persons temporarily detained pursuant to [*Terry* ] stops are not 'in custody' for the purposes of *Miranda."* *Id.* at 440, 104 S.Ct. 3138.

Here, Appellant was observed standing between two "obvious[ly]" cultivated patches of plants, believed to be marijuana, prior to approaching Hamilton, who was unarmed and not in uniform. The officers on the scene could well have harbored a reasonable suspicion, based upon specific and articulable facts, that Appellant may have been engaged in criminal activity.

 However, the Supreme Court has explicitly recognized that a valid *Terry* stop may evolve into a custodial setting in which the dictates of *Miranda* will apply. *See Berkemer* at 440, 104 S.Ct. 3138 (where a suspect detained pursuant to a valid *Terry* stop "thereafter is subjected to treatment that renders him 'in custody' for practical purposes, [the suspect] will be entitled to the full panoply of protections prescribed by *Miranda"*). Again, whether a valid *Terry* stop has evolved into *a de facto* arrest is determined based upon "how a reasonable man in the suspect's position would have understood his situation," *Id.* at 442, 104 S.Ct. 3138, and, as we already have found based upon our preceding custody analysis, a reasonable person in Appellant's position would have deemed himself to be in custody.

---

**3.** *Terry* was decided in the context of a Fourth Amendment "search and seizure" claim, whereas this case involves no claim implicating the Fourth Amendment. No opinion is expressed herein concerning an unclaimed violation of Appellant's right to be free from unreasonable search or seizure. Nevertheless, inasmuch as Appellant's claim is bottomed on an argument that he was in custody, and to the extent *Terry* speaks to that question, it is appropriate to consider *Terry* and its progeny here.

The State points to *Donnell* and *State v. Middleton,* 854 S.W.2d 504 (Mo.App. W.D. 1993), in support of its argument that Appellant was subjected to nothing more than a valid *Terry* stop. Such reliance is misplaced.

In *Donnell,* we acknowledged that *"Miranda* warnings are not required when a police officer is conducting a preliminary on-the-scene investigation to determine the nature of the situation. Even if the [detainee] is the focus of the investigation, no *Miranda* warning is required *when the inquiry is preliminary and has not become accusatory." Id.* at 736 (emphasis added). It is upon the emphasized language from the preceding quote that the State's reliance on *Donnell* founders. Indeed, the *Donnell* court later cited with approval a Wisconsin case in which the court held that the appellant had not been in custody because " 'no police trickery or deception was used.' " *Id.* at 737 (quoting *State v. Esser,* 166 Wis.2d 897, 480 N.W.2d 541, 543 (1992)). Here, in contrast, Hamilton admitted in his testimony that the "box camera" line of questioning he employed was intended to elicit an incriminating response from Appellant, that it was a "bluff" the intent of which was "to make [Appellant] believe that there [was] evidence against him." Hamilton described the "technique" as one designed "to make a person who's normally lying to go ahead and—and tell the truth." This approach to questioning Appellant, which the State acknowledged was a "ruse," does not strike us as the sort of "preliminary, investigatory questions by police" that do not indicate a person is in custody. *Donnell* at 737 (quoting *State v. Crane,* 841 S.W.2d 271, 273 (Mo.App. W.D.1992)).

The holding in *Middleton* is inapposite here for much the same reason. There, the western district of this court, in the course of a careful analysis and application of the law in Missouri concerning custodial interrogation, acknowledged that *"Miranda* makes exception for investigatory questions by the police[.]" *Id.* at 511. However, the *Middleton* court, in finding that the defendant there was not in custody when he made incriminating statements to police, specifically noted in support of its holding that on the facts before it, there was "no evidence of strong-arm tactics, deceptions or trickery to obtain incriminating statements. The police questions were straightforward." *Id.* at 511. As we have indicated, this clearly was not the case here. We find, on the record before us, and based upon the totality of the circumstances, that what may arguably have begun as a valid *Terry* stop became a custodial situation prior to the making of Appellant's incriminating statement to Hamilton, and that the requirements of *Miranda* were, therefore, applicable.

## C. Was Appellant Interrogated?

 Having determined that Appellant was in custody at the time of Hamilton's questioning, we are left only with the relatively straightforward question whether he was subjected to un-Mirandized interrogation subsequent to being placed in custody.

The *Miranda* Court held that by "custodial interrogation," it "mean[t] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. 1602. The Court expounded on this fairly simple definition in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), where it stated that *Miranda* applies when a suspect is subjected either to express questioning or its functional equivalent—words or actions the police should know are reasonably likely to elicit an incriminating response. *Id.* at 300–02, 100 S.Ct. 1682; *see also State v.*

898

*Cook,* 67 S.W.3d 718, 721 (Mo.App. S.D. 2002).

Applying the standard announced in *Miranda* and *Innis* to the facts here, there is little doubt that Appellant was subjected to custodial interrogation. Indeed, having staked its argument on a contention that Appellant was not in custody for purposes of a *Miranda* analysis, the State makes no contention otherwise. The questioning was initiated by Hamilton subsequent to the point in time at which a reasonable person would have believed himself to be in custody and consisted of express questions designed to elicit an incriminating response, specifically, the "box camera ruse" that Hamilton admitted was an oft-used technique to encourage a suspect's confession.

## V. Conclusion

We find, based on the totality of the circumstances, that Appellant was subjected to custodial interrogation without having been advised of his rights as required by *Miranda.* The exception to *Miranda* carved out by *Terry* and its progeny does not apply here, and we must therefore hold that the evidence was insufficient to support the trial court's findings that Appellant's Fifth Amendment rights were not violated and that his statement to Hamilton should not have been suppressed. See *Donnell* at 733.

The judgment is reversed, and the case is remanded for new trial consistent with this opinion.

BARNEY, P.J., and PREWITT, J., concur.