**STATE of Missouri, Plaintiff–Respondent,**

v.

**Justin D. SARDESON, Defendant–Appellant.**

No. 27724.

Missouri Court of Appeals, Southern District, Division Two.

April 27, 2007.

Ellen H. Flottman, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Jayne T. Woods, Assistant Attorney General, for respondent.

PHILLIP R. GARRISON, Judge.

Justin D. Sardeson ("Defendant") was convicted by a jury of second degree murder, a violation of Section 565.021,[1] for the death of his five-month-old son, Trey Crawford ("Victim"). He appeals his conviction, alleging that the trial court erred in (1) overruling his motion to suppress statements given to officers, because he was subject to custodial interrogation prior to having been informed of his *Miranda*[2] rights; and (2) admitting, over objection, his extrajudicial statements because there was no independent proof of the *corpus delicti* of homicide. We affirm.

On August 4, 2001, Defendant's girlfriend, Jennifer Crawford ("Jennifer"), gave birth to Victim. Jennifer and Victim lived with Jennifer's parents, Nikki and Larry Crawford ("Nikki" and "Larry"), for three weeks, before moving in with Defendant. Defendant and Jennifer married on October 1, 2001, and a week later they moved back in with Jennifer's parents. Victim was taken to the hospital on November 23 and December 16, 2001, for separate injuries. Due to suspected abuse, the Department of Social Services (the "Department") was contacted after the second trip to the hospital. After investigation, the Department determined that it was safe to return Victim to his family, and he was released from the hospital.

Without Jennifer or Defendant's consent, Nikki and Larry decided that Victim should stay with Nikki's father and stepmother, James and Mary Cathey. Jennifer and Defendant did not know where Victim had been taken, and Defendant moved out of the Crawford's home the next day. Eventually, Jennifer found out where Victim was, and Victim was returned to his parents. On December 20, 2001, Jennifer and Victim moved in with Defendant, who was then living with his mother, Betty Kammerer ("Kammerer").

On January 29, 2002, Larry picked up Jennifer and Victim at Kammerer's house, and he dropped Jennifer off for a class.

---

1. All references to statutes are to RSMo (2000) unless otherwise indicated.

2. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966).

While Jennifer was in class, Nikki and Larry took Victim to visit with other family members, and Victim appeared happy and playful. The Crawford's dropped Jennifer and Victim off at Kammerer's house around 9:15 p.m.

Around 2:00 a.m. the next morning, Jennifer called her parents crying and screaming and told them to come over because Victim was not breathing. At some point, Defendant had instructed Kammerer to call 911. When the paramedics arrived, Defendant was performing CPR on Victim in the living room. Jennifer's parents arrived later to find the paramedics attending to Victim, who was not breathing and did not have a pulse. While en route to the hospital, the paramedics were able to obtain a pulse for a brief period, but Victim was clinically dead when they arrived at the hospital, and the doctors were unable to revive him.

Officer Richard Neal ("Officer Neal") responded to the 911 call and was told by Defendant that he woke up and went to the bathroom, and as he was returning to bed, he noticed that Victim, who had been sleeping between himself and Jennifer, was not breathing. Defendant told him that he woke up Jennifer, and they moved Victim into the living room, where he began performing CPR.

The autopsy performed on Victim revealed a recent abrasion to Victim's forehead, and several bruises around Victim's right eye, chin, forehead, shoulder blades, and hip area. The autopsy also revealed a skull fracture that was several weeks old.

Pathologist, Dr. James Shelley ("Dr. Shelley"), found a number of hemorrhages in Victim's thymus gland and lungs, indicating that Victim died of asphyxiation.

Dr. Shelley also discovered two rib fractures, one occurring within twelve hours of Victim's death, as well as internal hemorrhaging beneath the connective tissue of the chest cavity.

The next day, Officer Rick Hamilton ("Officer Hamilton") with the Webster County Sheriff's Department contacted the State Technical Assistance Team ("STAT Team"), a state agency that is required by statute to investigate the death of all children under sixteen. STAT Team investigators, Officer Vernon Taylor ("Officer Taylor") and Officer Dan Stewart ("Officer Stewart"), traveled to Webster County to assist in the investigation of Victim's death. Carolyn Roth,[3] with the Division of Family Services ("DFS"), arranged for the STAT Team to conduct interviews with members of Victim's family at the DFS office in Marshfield, Missouri.

Arrangements were made for Defendant to be interviewed on February 19, 2002. At that point, the STAT Team had already interviewed several other people regarding Victim's death. Defendant was having car trouble the morning of the interview, so his step-father drove both Defendant and Jennifer to the DFS office. The interview was conducted in a conference room in an unsecured area of the office. Defendant entered the conference room alone, where Officer Stewart, Officer Taylor, and Officer Hamilton were waiting to interview him. Defendant was immediately told he was not under arrest and he was free to leave at any time. Defendant was not restrained in any manner during questioning. Officer Stewart was not in uniform and was not carrying a firearm.[4]

Defendant was first asked about Victim's prior injuries. While discussing the

---

3. At the time, Ms. Roth was known as Carolyn Key.

4. We cannot ascertain from the record whether this was true of Officer Taylor and Officer Hamilton.

circumstances surrounding those injuries, Officer Hamilton became suspicious because Defendant's answers were inconsistent with past investigations into those incidents. Officer Hamilton then employed the "third party" interrogation technique, telling Defendant that he had a family member involved in a similar situation, who had a person inside him that made him do things he normally would not do. Officer Hamilton suggested that Defendant might have a person inside him that caused him to do things that he normally would not do. Officer Hamilton also used the "assumption technique" telling Defendant that "you know I know what the truth is, don't you?" At that point, Defendant nodded "yes" and he started to cry. Officer Hamilton then asked Defendant to tell them what had happened.

Defendant explained that the night Victim died, he was really angry at Nikki for taking Victim out into the cold, and as he lay in bed he got even angrier. Defendant explained that "I rolled over, I put my elbow on the child's back and neck, I pushed and I pushed and I pushed, and I heard the baby wiggle and gasp." Defendant said that he pushed harder when he felt Victim struggle underneath him. Defendant explained that when he realized what he had done, he picked Victim up and started performing CPR. Defendant said that he woke Jennifer up and yelled for Kammerer to call 911.

Defendant was then asked again about Victim's prior injuries. Defendant explained that one of Victim's injuries occurred when he hit Victim with a closed fist on the right side of his head, and that on another occasion he had "karate-chopped" Victim in the back of his head. Defendant said that he had been angry with Jennifer and her parents, and he did not believe Victim was his child because he looked more like Jennifer's family. Defen-

dant said that sometimes he would get so mad that he just felt like killing something. Defendant stated that he wanted to get everything out of his head, and every time he did something to Victim, he felt "like shit." Defendant then said he felt like killing himself. At that point, Officer Hamilton and Officer Stewart went outside the room and decided to officially place Defendant in custody. When they returned to the conference room, they arrested Defendant, advised him of his *Miranda* rights, and offered him a waiver form. At 12:05 p.m., Defendant agreed to waive his rights and make a statement. He then repeated to the investigators what had happened the night Victim died.

Defendant provided two written statements, the first of which read as follows:

All I want is someone to help me. I don't want this man in me now [sic] more. I was real, real angry with Nikki, Jen's mom, taking [Victim] out in the cold and she kept calling me a bastard, and I just wanted her to stop going behind my back, say [sic] those things about me. That night, I was so mad, so I took the anger out on [Victim]. I felt really bad for what I done, so I tried bringing him back. This was not me. I can't do this—this any more. I am feeling real sorry for what I done. I just want help. I was laying there and I rolled over and laid on him so he could not breathe, and when he stopped, I picked him up and started to cry because I felt really bad about what I[sic] done. This was the night he passed away.

Defendant provided a second written statement regarding the prior abuse of Victim, which read as follows:

I hit [Victim] in the head with the side of the [sic] my hand, and I also hit him with my fist one time. Then I felt real bad because [Nikki] made me very an-

gry. Sometime[s] I can't control my anger and I would hit him, not meaning to. Sometime[s] I would burp him, I would use the hard part of my palm and use my fingers to help him burp. I bruised him one time. Jennifer sometimes would get angry and spank him because he would not go to sleep. He wanted to play, but not sleep. The handprint in the pictures are Jennifer's.

After providing the written statements, Defendant asked to speak to Jennifer so he could explain what happened. When Jennifer entered the conference room, Defendant told her, "I did it. I hurt [Victim]." Defendant was then taken to jail, where he was allowed to make a phone call to Kammerer, which was recorded and introduced at trial. In relevant part, Defendant's conversation with Kammerer was as follows:

Defendant: It wasn't my fault, mom.

Kammerer: I know it wasn't your fault[.]

Defendant: I just got mad.

Kammerer: What do you mean you just got mad? At [Victim]?

Defendant: No, at Jennifer and her mom and dad, and I took it out on him.

. . . .

Defendant: I didn't mean to hurt him— but I got mad.

Defendant was charged with first-degree murder. Defendant has been tried and convicted twice of second-degree murder. We reversed Defendant's first conviction in *State v. Sardeson*, 174 S.W.3d 598 (Mo. App. S.D.2005). Following a jury trial, Defendant was again convicted of second-degree murder. Defendant waived his right to jury sentencing, and the trial court sentenced him to thirty years imprisonment. This appeal followed.

■ In his first point, Defendant argues that the trial court erred in denying his motion to suppress the statements he made to Officer Hamilton and the STAT Team investigators, because he was subjected to custodial interrogation without being warned of his *Miranda* rights. Defendant further argues that any statements he made after he waived those rights are also inadmissible because "improper tactics rendered the warnings ineffective in that a reasonable person in [his] shoes could not have understood them to convey a message that he retained a choice about continuing to talk." Because Defendant was not in custody prior to being warned of his *Miranda* rights, we find that his statements were properly admitted.

■ "Where a motion to suppress was overruled and the evidence was introduced at trial, appellate review considers the evidence presented both at the suppression hearing and at trial in determining whether the motion should have been granted." *State v. Daggett*, 170 S.W.3d 35, 45 (Mo. App. S.D.2005)(quoting *State v. Reed*, 157 S.W.3d 353, 356 (Mo.App. W.D.2005)). This Court's review is limited to a determination of whether substantial evidence exists to support the trial court's ruling. *State v. West*, 58 S.W.3d 563, 567 (Mo.App. W.D.2001). We view all evidence and reasonable inferences in the light most favorable to the trial court's ruling. *State v. Granado*, 148 S.W.3d 309, 311 (Mo. banc 2004). "We defer to the trial court's opportunity to determine the weight of the evidence and credibility of the witnesses when deciding whether sufficient evidence supports the trial court's determination." *Daggett*, 170 S.W.3d at 45. "When, however, the issue to be decided involves the constitutional protection against forced self-incrimination, our review of the trial court's ruling is a two-part inquiry: we defer to the trial court's determinations of witness credibility and findings of fact, but consider the court's conclusions of law *de*

*novo." State v. Tally,* 153 S.W.3d 888, 892 (Mo.App. S.D.2005).

The Fifth Amendment to the United States Constitution provides in part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This provision is applicable to the States in all criminal prosecutions. *Dickerson v. United States,* 530 U.S. 428, 432, 120 S.Ct. 2326, 2329, 147 L.Ed.2d 405 (2000). Any statement given by a suspect, which is the product of custodial interrogation, is inadmissible on the issue of the defendant's guilt of the charged offense when made without the benefit of having been informed of his rights under the Fifth Amendment. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* Here, the State does not dispute that Defendant's statements were the result of questioning initiated by law enforcement. Therefore, the admissibility of Defendant's statements, made prior to being warned of his rights, hinge upon whether or not he was "in custody."

"*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). "In Missouri, 'custodial interrogation' is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *State v. Glass,* 136 S.W.3d 496, 511 (Mo. banc 2004). "In deciding whether a suspect is 'in custody' at a particular time, courts examine the extent of the restraints placed on the suspect during the interroga-

tion in light of whether a reasonable person in the suspect's position would have understood the situation to be one of custody." *State v. Brooks,* 185 S.W.3d 265, 273 (Mo.App. W.D.2006)(citing *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

"We [also] look to the totality of the circumstances, including the accused's actual and perceived freedom to leave, and the purpose, location, and length of the interrogation." *Id.* at 274. In examining the totality of the circumstances, we consider the following factors: (1) whether the suspect was informed that the questioning was voluntary, that they were free to leave, or they were not under arrest; (2) whether the suspect possessed unrestrained freedom of movement; (3) whether the suspect initiated contact with law enforcement or voluntarily acquiesced to requests for questioning; (4) whether strong arm tactics or deceptive stratagems were employed; (5) whether the atmosphere surrounding the questioning was police-dominated; and (6) whether the suspect was arrested at the end of questioning. *State v. Werner,* 9 S.W.3d 590, 595 (Mo. banc 2000). "This list is not exhaustive." *Id.* All pertinent factors must be considered in the context of determining whether a reasonable person in the suspect's position would have understood the situation to be one of custody. *Brooks,* 185 S.W.3d at 274. Before determining whether the facts of the present case represent a custodial situation, we find it important to examine Missouri precedent relating to this issue.

In *Werner,* police went to the defendant's high school to investigate the death of his infant nephew. 9 S.W.3d at 593. The assistant principal brought the defendant, who was a sixteen-year-old special education student, and his sister to the school office, where officers informed them

that they were investigating the infant's death and wished to interview them. *Id.* The defendant and his sister agreed to go with the officers to the police station, and they were transported there by the officers in separate vehicles. *Id.* When they arrived, the defendant and his sister were placed in separate rooms, and the defendant was escorted to the bathroom whenever he requested to use it. *Id.* The defendant, who was not restrained, waited for two hours before officers began to question him. *Id.* at 593–94. He was not given *Miranda* warnings prior to questioning. *Id.* at 594. The defendant gave his account of what happened the night of his nephew's death. *Id.* During the course of interviewing the defendant, the officers twice left the defendant's room to interview another witness, both times returning to inform the defendant that his story was inconsistent with what the other witness had told them. *Id.* After the officers confronted him with the inconsistencies a second time, the defendant made incriminating statements regarding his involvement in the infant's death. *Id.* The officers then stopped the interview. *Id.*

In determining that the defendant was in custody when the police questioned him, the Court noted that he did not voluntarily talk with the police but was summoned by officers, removed from school, isolated from friends and family, and questioned by two detectives without receiving *Miranda* warnings. *Id.* at 598. The Court also explained that, "[t]here is no evidence that [the defendant], a sixteen-year-old functioning at a fourth-grade level, who was unfamiliar with police procedures, understood that he could refuse to answer the officers' questions, or simply leave.... A reasonable person in [the defendant's] situation would have thought himself to be in custody." *Id.*

In *Glass,* an officer investigating a homicide initially engaged in voluntary discussion with the defendant outside his home. 136 S.W.3d at 509. The officer was not carrying a weapon and was not in uniform. *Id.* The defendant gave consent to the officer to search his car. *Id.* at 504. The defendant then agreed to accompany the officer to the police station. *Id.* at 509. The defendant was not placed under arrest or put in handcuffs, and he rode in a police car to the station, because his car was being searched. *Id.* On the way there, they stopped so the defendant could purchase some cigarettes. *Id.* At the station, as he was being interviewed, the defendant was given food and breaks, and he was allowed to go outside, without handcuffs, to smoke cigarettes. *Id.* The defendant gave a written statement prior to being given *Miranda* warnings. *Id.* at 504–05. After he was read his rights and he waived them, he gave two additional written statements. *Id.* at 505.

In finding that the defendant was not in custody prior to giving his first statement, the Court noted that the defendant had not been deprived of his freedom of action in any significant way up to that point. *Id.* at 511. The Court also related that "in the absence of arrest or restraint of freedom of movement, questioning that takes place in a coercive environment does not require *Miranda* warnings." *Id.* (quoting *State v. Feltrop,* 803 S.W.2d 1, 13 (Mo. banc 1991)).

The facts before this Court in *Tally* were as follows. Officers in a helicopter observed the defendant standing between two patches of cultivated marijuana plants. 153 S.W.3d at 890. The officers in the helicopter gestured to the suspect to walk towards the house on the property. *Id.* As the defendant was doing so, another officer who was on the ground approached him and ordered him to get on his knees and raise his arms. *Id.* at 891. The de-

fendant asked if he was under arrest, and the officer told him that "at that time" he was not under arrest. *Id.* As the helicopter was hovering nearby, and with several other officers in the area, the officer then began discussing the use of "box cameras" with the defendant, implying that pictures had been taken in the field with the use of concealed cameras. *Id.* At that point, the defendant immediately confessed that the plants were for his personal use. *Id.*

We related in *Tally* that "[a]pplying the [factors] cited by the court in *Werner*, we find that [the defendant] was in custody at the time he gave to [law enforcement] the incriminating statement that he argues should have been suppressed by the trial court." *Id.* at 893–94. We recognized that while the defendant was told he was not under arrest, the presence of the officers and the helicopter hovering overhead suggested that a reasonable person in the defendant's situation would not have felt that he enjoyed unrestrained freedom of movement. *Id.* at 894. We also noted that the interaction was not consensual, that deceptive tactics were used, that the atmosphere was police dominated, and that the defendant was placed under arrest at the termination of questioning.· *Id.* at 894–95.

In *Brooks*, the defendant agreed to go to the police station and give a statement after an infant she was baby-sitting had stopped breathing. 185 S.W.3d at 268. The officer drove the defendant to the station because she did not have transportation, and placed her in an interrogation room alone with another officer. *Id.* The defendant was told that the questioning was voluntary, and that she could take a break for food or to use the bathroom, and that she would take her home. *Id.* After the defendant went through what had happened to the child, she said she was tired of talking and wanted to go home, but

after encouragement by the officer she agreed to continue the interview. *Id.* at 269. The defendant again asked to go home, to which the officer responded, "we should be just another half hour and that's it. Okay?" *Id.* The defendant nodded that she would continue, but first she called her boyfriend who informed her that the child had died. *Id.* Upon hearing this, the defendant began to cry, and she ended the phone call and continued the interview. *Id.*

In determining that the defendant was not in custody at this point of the interrogation, the Court in *Brooks* explained as follows:

> She had initiated the contact with the officers as a citizen. She had good reason to voluntarily make a statement. It was a normal police investigation of the circumstances of the fact that the baby had stopped breathing. [She] acquiesced in the entreaties to complete the statement. Until the formal statement was completed, she had no reason to think anything other than that she was being a good citizen voluntarily giving a statement to the police so they could proceed with their investigation and she could appear cooperative.

*Id.* at 281. In distinguishing *Werner* and *Tally,* the Court noted that the officers in those cases were clearly restricting the movements of those suspects. *Id.* at 279.

The Court, did however, determine that during the course of the officer's questioning of the defendant, the interrogation became custodial. *Id.* at 281. After the officer conducted a third interview, which was a repeat of the first two, she turned off the audio recorder, repositioned herself closer to and directly across from the defendant, leaned forward on her elbows, looking directly into the defendant's face and said, "I promise we'll leave after this." *Id.* at 270. Without asking whether the

defendant would continue, the officer went into a long monologue lasting several minutes, encouraging the defendant to tell her anything that she had not disclosed up to that point. *Id.* at 270–71. Eventually, the defendant admitted to putting a blanket over the baby so it would stop crying. *Id.* at 271. The officer then read the defendant her *Miranda* rights, and the defendant signed a form indicating that she understood her rights. *Id.* The defendant ultimately admitted to putting a blanket over the baby's face and applying pressure for "about a minute" until the baby stopped crying. *Id.* The officer then reactivated the tape recorder to record the defendant's confession. *Id.*

The Court, in *Brooks,* found that what it had labeled the fourth stage of interrogation was not like the unwarned statement made in *Glass. Id.* at 281. The Court concluded that when the officer said, "I promise we'll leave after this," the interrogation became custodial, explaining:

> We look to the fact that [the defendant], who had been at the station several hours, had already voluntarily provided extensive statements. Then, after having been informed that the statements were concluded, when she no doubt expected to be released, she was essentially *told* (not asked) to remain still longer, with the promise that "after this" she could leave. The officer, without explanation, divested [the defendant] of any control she had previously had of the interview process. . . . Because [the defendant] was given no opportunity to know what "this" was or how long "this" would take, and because the officer purposely avoided discussion about the pur-

pose or the length of the next stage of the interview, the officer's statements left [the defendant] at the officer's mercy.

*Id.* at 282 (emphasis in original).

Applying the principles of law set out above and considering the foregoing precedent, we find that, in the present case, Defendant was not in custody prior to being advised of his *Miranda* rights. Defendant, who voluntarily agreed to be questioned regarding the death of Victim, secured his own transportation to the DFS office where questioning was to occur. Defendant was taken to an unsecured area of the office and prior to questioning, he was told that he was free to leave at any time, and his freedom of movement was not restrained in any way. Defendant was alone in the room with the officers, but there is no indication that he was purposely isolated from Jennifer or his step-father during questioning.[5] While Officer Hamilton employed deceptive interrogation techniques, and Defendant was arrested after he made incriminating statements and threatened to kill himself, we do not believe that these factors gave rise to a custodial situation. The fact that Officer Hamilton viewed Defendant as a suspect at that point and hoped to elicit a confession or determine that Victim's death was not an accident, does not mean Defendant was "in custody." *Brooks,* 185 S.W.3d at 277. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."

---

5. Apparently believing that the interview would not last for very long, Defendant's step-father waited outside with his tow-truck running. Defendant relates in his brief that the officers closed the blinds in the conference room to prevent Defendant's step-father from looking in, but viewing the record in the light most favorable to the trial court's ruling, the record reveals that the blinds were closed because the tow-truck was very loud and it was right outside the window.

*Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138. Officer Hamilton's desire to elicit a confession does not give rise to the duty to warn. *Brooks,* 185 S.W.3d at 277.

While Defendant does not cite *Tally,* we note that, in that case, we found the use of deception by law enforcement to be a factor contributing to our determination that the defendant was in custody. However, *Tally* is distinguishable, in that there were additional factors which indicated custody including: the defendant did not voluntarily initiate the encounter, and the defendant's freedom of movement was restricted by the officers ordering him to his knees while a helicopter hovered overhead. There were no such circumstances in the present case.

Neither is the present case like the one in *Werner.* In that case, officers showed up at the defendant's school, and without notifying his parents, transported him to the police station, at all times isolating him from his family and friends. The defendant was never told that he was not under arrest, or that he did not have to answer questions. The Court in *Werner* also explained that under the circumstances of that case, a sixteen-year-old functioning at a fourth-grade level would not understand that he could refuse to answer the officers' questions, or simply leave. Here, unlike the defendant in *Werner,* Defendant was not a minor, secured his own transportation to the DFS office, and was told that he did not have to answer questions.

We find that the circumstances surrounding Defendant's interrogation were more like that in *Glass* and the initial round of questioning in *Brooks.* Like the defendants in those cases, Defendant voluntarily agreed to answer questions at law enforcement's request, and was not restrained in any way throughout the interrogation. Additionally, like the defendant in *Brooks,* Defendant was told that he

was not under arrest and he did not have to answer any questions.

We also find that the present case is similar to that before the United States Supreme Court in *Mathiason,* 429 U.S. at 492, 97 S.Ct. 711, in which the defendant was found not to have been in custody. In that case, the defendant agreed to meet an officer at the police station regarding the investigation of a theft. *Id.* at 493, 97 S.Ct. 711. When the defendant arrived, the officer met him in the hallway, and was taken into an office, where he was told he was not under arrest. *Id.* The door was closed, and the two sat across a desk from one another. *Id.* The officer said he wanted to talk to him about a burglary, and that the police believed he was involved. *Id.* The officer falsely stated that the defendant's fingerprints were found at the scene. *Id.* The defendant sat there for a few minutes and then admitted to taking the property. *Id.* In finding that the defendant was not in custody, the United States Supreme Court explained that "there is no indication that the questioning took place in a context where [the defendant's] freedom to depart was restricted in any way." *Id.* at 495, 97 S.Ct. 711. The Court explained that the officer's false statement about having discovered the defendant's fingerprints at the scene had nothing to do with whether the defendant was in custody. *Id.* at 495–96, 97 S.Ct. 711.

After examining the totality of the circumstances surrounding the questioning of Defendant, we find that a reasonable person in Defendant's position would not have understood the situation to be one of custody. *Brooks,* 185 S.W.3d at 274. Therefore, the trial court did not err in overruling Defendant's motion to suppress statements made to Officer Hamilton and the STAT Team. Because Defendant was not in custody prior to being warned, we

need not address Defendant's argument regarding the admissibility of his statements made after he waived his *Miranda* rights.

In addition to the above, we note that the State presented evidence of voluntary statements made by Defendant to Jennifer and Kammerer, in which he indicated his guilt. Assuming *arguendo,* that Defendant's allegation of error has merit, Defendant's voluntary statements removed any resulting prejudice.

As previously related, after Defendant waived his *Miranda* rights and provided written statements, he asked to speak to Jennifer, and when she entered the conference room, he said, "I did it. I hurt [Victim]." Additionally, the police recorded Defendant's conversation with Kammerer on a jail-house phone, in which he told her, that he got mad at Jennifer and Nikki and took it out on Victim. He also stated in that conversation that, "I didn't mean to hurt [Victim]—but I got mad."

Defendant's statements were not in response to any express questioning or its functional equivalent, therefore, *Miranda* did not apply. *State v. Elmore,* 43 S.W.3d 421, 425 (Mo.App. S.D.2001). Under the circumstances, Defendant's statements were voluntary, spontaneous, and properly admitted. *Id.* Additionally with respect to Defendant's recorded conversations, we note that, "[r]ecording a telephone conversation between a defendant and a third party does not involve a 'confrontation with governmental authority in the context of a custodial interrogation calling for *Miranda* warnings.'" *State v. Barrett,* 41 S.W.3d 561, 565 (Mo.App. S.D.2001)(quoting *U.S. v. Craig,* 573 F.2d 455, 474 (7th Cir.1977)). For the aforementioned reasons, we deny this point.

In Defendant's second point, he argues that the trial court erred in allowing his extra-judicial statements into evidence as substantive evidence of guilt because there was no independent proof of the *corpus delicti* of the offense of homicide. We disagree.

We review the trial court's ruling regarding the admissibility of evidence for abuse of discretion. *Daggett,* 170 S.W.3d at 43. The *corpus delicti* rule is an evidentiary rule which determines whether a defendant's confession may be considered as substantive evidence of guilt. *Id.* An accused's extra-judicial admissions, statements or confessions are inadmissible absent independent proof, either circumstantial or direct, of the essential elements of the *corpus delicti. Id.* "There is no requirement of full proof of the *corpus delicti* independent of the defendant's confession[,]" but, rather, "[a]ll that is required is evidence of circumstances tending to prove the *corpus delicti* corresponding with the confession." *Id.* The State has the burden to establish the *corpus delicti. State v. Warren,* 141 S.W.3d 478, 490 (Mo.App. E.D.2004). "The *corpus delicti* in a homicide case consists of proof of the death of the victim and evidence that the criminal agency of someone other than the victim caused the death." *Id.*

Defendant argues that the "cause of death was asphyxiation, which can occur from a child sleeping in bed with [his] parents[,]" and "[w]ithout [Defendant's] statements, there was no proof that the cause of death was homicide[.]" Defendant's argument ignores the following principles:

Only slight corroborating facts are needed to authorize the admission of a defendant's incriminating statements in evidence. If there is evidence of corroborating circumstances independent of

the confession, which tends to prove the offense by confirming matters related in the confession, both the corroborating circumstances and the confession may be considered in determining whether or not the *corpus delicti* has been established. Furthermore, evidence of the *corpus delicti* need not precede a defendant's admission so long as the essential elements of the crime are proved by the end of the trial. The determination of whether there is sufficient independent evidence of the *corpus delicti* of an offense is fact specific and requires a case-by-case evaluation.

*Daggett,* 170 S.W.3d at 43–44 (internal quotations and citations omitted).

The record reveals the following facts confirming that Victim died in the manner related in Defendant's confession: the medical examiner testified that Victim died from asphyxiation; Defendant was present when Victim died; there was a history of Victim suffering from physical abuse; there were three fresh bruises on Victim's back; Victim suffered a rib fracture near the time of his death; and Victim had internal hemorrhaging beneath the connective tissue of his chest cavity. Considering the corroborating circumstances together with Defendant's confession, we find that the State met its burden in establishing the *corpus delicti* of homicide. The trial court did not abuse its discretion in admitting Defendant's extra-judicial statements. This point is denied.

The judgment and sentence of the trial court is affirmed.

BATES, C.J., and BARNEY, J., concur.